IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 28, 2000

## ROCKY LEE COKER v. TENNESSEE DEPARTMENT OF CORRECTION

Appeal from the Chancery Court for Davidson County
No. 99-820-II    Carol L. McCoy, Chancellor

No. M1999-02268-COA-R3-CV - Filed August 7, 2001

An inmate in the custody of the Tennessee Department of Correction filed a petition for a declaratory judgment, claiming that his sentence reduction credits had been improperly calculated and that his "safety valve" release date had been wrongly cancelled.  The trial court granted the state's motion for summary judgment and the petitioner appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Rocky Lee Coker, pro se, Only, Tennessee.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Pamela S. Lorch, Assistant Attorney General, for the appellee, Tennessee Department of Correction.

### OPINION

Petitioner, Rocky Lee Coker, was sentenced to death in 1985 for first degree murder. *See State v. Coker*, 746 S.W.2d 167 (Tenn. 1987).  He was incarcerated at Riverbend Maximum Security Institute ("Riverbend"), where he was assigned to work as a law clerk.  Sentence reduction credits became available to Class X felons[1] in 1985, but because the petitioner was under a death sentence, he was ineligible to earn those credits.

In 1996, upon petition for post conviction relief, a judge found Mr. Coker's sentencing hearing to be "fatally flawed," and overturned the death sentence. *See Coker v. State*, No. 01C01-

---

[1] First degree murder was a Class X felony.  Tenn. Code Ann. § 39-2-202(c) [repealed].

9804-CC-00152, 1999 WL 228789 at *1 (Tenn. Crim. App. Apr. 21, 1999) (perm. app. denied Oct. 11, 1999). The petitioner was then sentenced to life in prison and was subsequently transferred from Riverbend to Southeastern Tennessee State Regional Correctional Facility (STSRCF) to complete his sentence. After his transfer, the petitioner became eligible to receive sentence reduction credits upon signing a "written waiver waiving the right to serve the sentence under the law in effect at the time the crime was committed." Tenn. Code Ann. § 41-21-236(c)(3). The petitioner signed the waiver in November 1999.[2]

Mr. Coker commenced this action seeking a declaratory judgment that he was entitled to two thousand forty-eight (2048) days of sentence reduction credits which he claims he would have earned pursuant to Tenn. Code Ann. § 41-21-236 had he not been wrongly sentenced to death and housed at Riverbend. He also claimed that he was entitled to a "safety valve" release date, pursuant to Tenn. Code Ann. § 41-1-501 *et seq.* The respondent, Tennessee Department of Correction ("the Department"), filed a Motion for Summary Judgment which the trial court granted. The petitioner appeals.

I. Summary Judgment

In its order, the trial court found, "No material facts are in dispute in this case and under the standard set out in *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), Respondent is entitled to judgment . . ." A trial court's grant of a motion for summary judgment presents a question of law that we review *de novo* without a presumption of correctness. *Finister v. Humbolt Gen. Hosp., Inc.*, 970 S.W.2d 435, 437 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). We must determine whether there is no genuine and material fact at issue, thereby entitling the Department, to judgment as a matter of law.

The questions a court must consider in determining whether to grant or deny a motion for summary judgment are (1) whether a factual dispute exists; (2) whether that fact is material; and (3) whether that fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214. "A disputed fact is material it if must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id.* at 215.

Once the moving party documents its assertion that there is no genuine issue of material fact, the burden then shifts to the nonmoving party to show the existence of such issue, requiring

---

[2]In his petition, Mr. Coker asserted that the Commissioner of Correction "disseminated a formal Memorandum to the Warden of each adult facility thereby requiring that all inmate sentence waivers be back dated to be effective March 1, 1986." The memorandum was attached to the brief as "Exhibit A." We have read the memorandum, and find no language requiring the backdating of the petitioner's waiver. The memorandum referred to a six month period in 1995, during which the Department planned to review waivers, and in some circumstances to allow backdating. Backdating was not mandatory under any circumstance, and the memorandum specifically stated, "After October 1, 1995, no waiver changes will be made without the approval of the Commissioner." The petitioner's sentence was changed to life imprisonment in 1996, more than a year after the Department reviewed the waivers.

submission to the trier of fact. *Id.* at 215. The nonmoving party cannot simply rely on its pleadings, but rather must set forth, by affidavit or discovery materials, specific facts showing a genuine issue of material fact for trial. *Id.* The evidence offered by the nonmoving party must be taken as true. *Id.* Finally, summary judgment shall be denied if there is "any doubt whether or not a genuine issue exists." *Id.* at 211. Thus, a summary judgment should be granted only when the undisputed facts reasonably support one conclusion - that the moving party is entitled to a judgment as a matter of law. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

## II. The Sentence Reduction Credits

As quoted by the trial court herein, the Court of Criminal Appeals explained the purpose of sentence reduction credits as follows:

> It is common knowledge that the institutions operated by the Tennessee Department of Correction have been and are filled to capacity. The number of prisoners who may be housed in these institutions is controlled by the United States District Court for the Middle District of Tennessee. *Grubbs v. Bradley*, 552 F. Supp. 1052 (M.D. Tenn.1982). The Legislature created the sentence reduction credits for prisoners confined to a Department of Correction institution so that inmates could be released at an earlier date to make room for others who had been convicted of a felony and sentenced to the Department of Correction. This legislation was enacted during the First Extraordinary Session of 1985, which was called to address prison overcrowding.

*Dezurn v. Mathney*, No. 88-225-III, 1989 WL 14155 at *3 (Tenn. Crim. App. Feb. 24, 1989) (perm. app. denied June 5, 1989).

One provision of the statute prohibits a maximum security prisoner from earning sentence reduction credits. Tenn. Code Ann. § 41-21-236(a)(7) ("such sentence credits shall not be earned or credited to any inmates classified as maximum security"). The petitioner contends that a factual dispute exists regarding whether he was classified as a "maximum security" inmate "within the intent of the provisions" of that statute.[3] He further contends that he is entitled to sentence reduction credits under the Equal Protection Clause "because other inmates properly sentenced to Life at the same time Petitioner was improperly sentenced to death, were and are allowed to receive their credits." The trial court held that "Since Petitioner, like all death row inmates, was a maximum security prisoner, he was ineligible to earn sentence reduction credits for the law clerk duties he performed while on death row." The court found no violation of the Equal Protection Clause, holding that "the statute bears a rational relationship to a legitimate state interest."

---

[3]In his response to the motion for summary judgment, the petitioner claimed factual disputes existed as to whether a prisoner's custody assessment points, access to other inmates and freeworld personnel, and work at a prison job showed that he was not a "maximum security inmate" as contemplated by Tenn. Code Ann. § 41-21-236(a)(7).

This court has previously addressed whether a prisoner whose death sentence is overturned is entitled to retroactive sentence reduction credits in *Laney v. Campbell*, No. 01A01-9703-CH-00142, 1997 WL 401829 (Tenn. Ct. App. July 18, 1997) (perm. app. denied Nov. 24, 1997). In that case, we determined that an inmate was "not entitled to received sentence reduction credits for activities or conduct taking place when the prisoner was ineligible to earn credits." *Laney v. Campbell*, 1997 WL 401829 at *1. The petitioner in that case, like the petitioner herein, had been sentenced to death for first degree murder but subsequently had his sentence reduced to life in prison. *Id.* Upon resentencing and transfer to another correctional facility, Mr. Laney became eligible to earn sentence reduction credits after he signed the necessary waiver. Like the petitioner herein, Mr. Laney sought sentence reduction credits he claimed he would have earned had he not been on death row. *Id.* We stated:

> Prisoners do not have a constitutional right to shorten their sentences by earning sentence reduction credits. These credits are creatures of statute, and, therefore, the right to receive or accrue them rests on the rules and criteria contained in the statutes authorizing them.

> Prisoners who committed crimes prior to December 11, 1985 are not entitled to earn sentence reduction credits for participating in programs when they are statutorily ineligible to accrue credits. When Mr. Laney signed the PSRC waiver in 1986, Tenn.Code Ann. § 41-21-236(a)(7) provided that maximum security prisoners could not earn prisoner sentence reduction credits. Since Mr. Laney, like all other death row inmates, was a maximum security prisoner, he was ineligible to earn sentence reduction credits for the educational programs he participated in while on death row.

> \*\*\*

> When Mr. Laney murdered the grocer in Kingsport, persons convicted of Class-X crimes were not entitled to earn prisoner sentence credits. Even after that restriction was eased, persons classified as maximum security were still ineligible to earn sentence reduction credits. Thus, Mr. Laney did not become eligible to earn sentence reduction credits until November 15, 1994 when his death sentence was replaced by life imprisonment. He has been earning sentence credits ever since November 1994, and the Department's refusal to award him additional credits retroactively for activities when he was ineligible to earn credits has not unconstitutionally lengthened his sentence.

*Id.* (citations omitted).

We agree with the trial court that the petitioner herein was a "maximum security" inmate and therefore not entitled to earn sentence reduction credits while he was at Riverbend under a death sentence. Likewise, regarding the Equal Protection claim, we agree with the trial court, that "the legislature could reasonably have decided that prison overcrowding could be remedied by extending

-4-

to the bulk of the prisoner population an opportunity to accumulate sentence reduction credits, while finding it unnecessary/inadvisable to afford to maximum security prisoners the same opportunity. Thus, the statute bears a rational relationship to a legitimate state interest."

## III. The "Safety Valve"

The petitioner contends that the trial court erred by entering a judgment as a matter of law regarding his "safety valve release date." He attached an "Inmate Information Request" form to his petition as "Exhibit B." Under "Reason for Request," the petitioner stated, "Please advise me of my Safety Valve Release Eligibility date pursuant to T.C.A. § 41-1-504?" Under "Staff Response," the answer stated, "You no longer have a safety valve release date. [Your] date was cancelled by the Governor." Implied, then, in the information request, and in the staff response, are the assumptions that petitioner once had the possibility of an early release because of an overcrowding situation, and that he no longer has that possibility available to him. The petitioner argues that he is entitled to a "safety valve parole release eligibility date," and that the Governor's "unconstitutional cancellation of his . . . safety valve date operated as an *ex post facto* enhancement of [his] punishment and a denial of due process . . ." We disagree.

The so-called "safety valve" was also enacted in 1985 in response to prison overcrowding. *See* Tenn. Code Ann. §§ 41-1-501 *et seq.* Pursuant to that legislation, upon certification by the Commissioner of Correction that the prison population has reached 95% of its capacity, or may reach that level in the near future, the Governor may declare that a state of overcrowding emergency exists. Tenn. Code Ann. § 41-1-503. The Governor has the power to reduce sentences of certain inmates upon the declaration of an overcrowding emergency, in order to reduce the prison population. Tenn. Code Ann. § 41-1-504. The Governor also has the discretion to declare certain "inmates or types of inmates" ineligible for release under this legislation. Tenn. Code Ann. § 41-1-504(b). Once the overcrowding emergency has been rectified, "the release eligibility dates of the inmates remaining within the department of correction shall revert automatically to the dates in existence prior to their reductions . . ." Tenn. Code Ann. § 41-1-505.

In *Kaylor v. Bradley*, 912 S.W.2d 728 (Tenn. Ct. App. 1995), this court rejected the same arguments regarding *ex post facto* laws and due process made in this case. That petitioner, as the petitioner herein, alleged that the statutes at issue did not allow the Governor to impose new or different restrictions on eligibility for early release after declaring an overcrowding emergency and that he was not afforded due process at the time additional restrictions were placed on eligibility for the early release program. *Kaylor*, 912 S.W.2d at 730. In that case, as in this one, the crime for which the prisoner was incarcerated was committed prior to the enactment of Tenn. Code Ann. § 41-1-501 *et seq.* in 1985. Because the enactment of the early release program granted the prisoner the possibility of an earlier release from custody than was available at the time the crime was committed, we found no violation of the *ex post facto* clause in either the state or federal constitution, and held that "his right to be considered for early release can be no greater than the rights conferred in the statutes establishing the program." *Id.* at 734. We further observed:

-5-

The early release program does not establish an unconditional right to early parole. It creates, at most, a temporary, conditional opportunity to be considered for early release. The program is available only to inmates who have not been excluded by the governor, and it lasts only as long as the overcrowding emergency exists. Once the system's population returns to ninety percent or less than its designated capacity, the remaining inmates are no longer eligible to be considered for early release and their "release eligibility dates ... shall revert automatically to the dates in existence prior to their reductions pursuant to ... [the declaration of an overcrowding emergency]."

***

Mr. Kaylor asserts that the statutes do not permit the governor to impose new or different restrictions on the eligibility for early release after declaring an overcrowding emergency. We do not read Tenn.Code Ann. § 41-1-504(b) so narrowly. The statute empowers the governor to impose any restrictions on eligibility for early release that he or she may wish to impose, and it specifically states that

> [t]here shall be no limits on the number or types of such restrictions the governor may impose on early release eligibility as long as a sufficient number of inmates are eligible for consideration to reduce the in-house population of appropriate state correctional facilities to ninety percent (90%) of the relevant designated capacity.

*Id.* at 734-35 (citations omitted).

Regarding the petitioner's argument that he was not afforded due process at the time the Governor decided not to allow inmates convicted of homicide to become eligible for early release, this court stated:

The Due Process Clauses of the state and federal constitutions protect only genuine claims involving pre-existing entitlements. They do not protect unilateral expectations or abstract needs or desires. Thus, Mr. Kaylor's petition states a due process claim only if he acquired a vested right to an early release or a vested right to be considered for early release. State law provides him with neither.

Inmates eligible for early release consideration do not have a statutory right to be paroled early. The parole board retains the right to decide which inmates should be paroled and may decline to release an inmate if it cannot conclude with reasonable probability that the inmate, if released, will live and remain at liberty without violating the law and that the inmate's release is consistent with society's welfare. Likewise, eligible inmates do not have a vested right to be considered for early release because the governor retains the power to alter the eligibility criteria at any

-6-

time and because the opportunity to be considered for early release lapses once the overcrowding emergency abates.

*Id.* at 735 (citations omitted).

We agree with the trial court that the Department is entitled to a judgment as a matter of law, and affirm the grant of summary judgment on this issue.

## IV. Conclusion

We affirm the trial court's grant of summary judgment to the Department of Correction. This case is remanded for such further proceedings as may be necessary. Costs are taxed to the appellant, Rocky Lee Coker, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE